UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES,<br>*Plaintiff*,<br><br>v.<br><br>GERARD BROWN,<br>*Defendant.* | No. 3:16-cr-00019 (VAB) |

**RULING ON MOTION FOR COMPASSIONATE RELEASE**

Gerard Brown ("Defendant") has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). Mot. for Compassionate Release, ECF No. 1144 (Sept. 18, 2020) ("Def.'s Mot."); Mem. in Supp. of Revised Mot. for Reduction of Sentence Under First Step Act: Compassionate Release, ECF No. 1144-1 (Sept. 18, 2020) ("Def.'s Mem.").

The United States (the "Government") opposes his motion. Mem. in Opp'n to Def.'s Mot. for Compassionate Release, ECF No. 1146 (Sept. 24, 2020) ("Gov't Opp'n").

For the reasons set forth below, Mr. Brown's motion for compassionate release is **DENIED**.

## I. BACKGROUND

On January 28, 2016, a grand jury returned a thirty-eight-count indictment against Mr. Brown and nineteen co-conspirators. Sealed Indictment, ECF No. 11 (Jan. 28, 2016).

On April 10, 2017, Mr. Brown pled guilty to conspiracy to possess with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), a lesser included offense of Count One of the indictment. Plea Agreement, ECF No. 590 (Apr. 10, 2017).

1

On August 30, 2018, Mr. Brown was sentenced to a term of imprisonment of 100 months, a term of five years of supervised release, and a special assessment of $100. J., ECF No. 1088 (Aug. 30, 2018).

On August 21, 2020, Mr. Brown moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Mot. for Compassionate Release, ECF No. 1137 (Aug. 21, 2020).

On August 26, 2020, the Court directed the Clerk of Court to appoint counsel from the Federal Defender's Office to handle Mr. Brown's motion. Order, ECF No. 1138 (Aug. 26, 2020).

On September 18, 2020, Mr. Brown filed a revised motion to reduce his sentence under the First Step Act. Def.'s Mot.; Def.'s Mem.

On September 24, 2020, the Government opposed Mr. Brown's motion. Gov't Opp'n.

On October 2, 2020, Mr. Brown filed a supplemental memorandum in support of his motion for compassionate release. Mem. in Support, ECF No. 1150 (Oct. 2, 2020) ("Def.'s Supp. Mem.").

On October 28, 2020, the Court held a hearing by videoconference. Min. Entry, ECF No. 1153 (Oct. 28, 2020).

## II. STANDARD OF REVIEW

A court may modify a term of imprisonment on compassionate release grounds in two circumstances: (1) "upon motion of the Director of the Bureau of Prisons [("BOP")];" or (2) "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . ." 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020) ("In December 2018, as part of the First Step Act, Congress worked a change to

th[e] rule of long standing" that a court could only modify a sentence upon motion from the Bureau of Prisons. "A court may now consider a motion for compassionate release made by a defendant who has exhausted his administrative remedies by petitioning the Director of the BOP to make such a motion, assuming the Director fails to act on the inmate's request within thirty days[.]").

A court may only grant such a modification if it finds that "extraordinary and compelling reasons warrant" release. In determining whether to grant a motion to modify a sentence, a court must also consider the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A).

### III. DISCUSSION

Section 3582(c)(1)(A) authorizes courts "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." *United States v. Brooker*, No. 19-3218-CR, -- F. 3d. --, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."); *see United States v. Gonzalez*, No. 3:15-cr-00223 (MPS), 2020 WL 5793304, at *1 (D. Conn. Sept. 29, 2020) ("[B]ecause [Mr.] Gonzalez – and not the [BOP] – brings the instant motion, [the Court is] not bound by the Sentencing Commission's outdated policy statement applicable to Section 3582(c)(1)(A) . . . , which the Second Circuit recognized as only applying to motions for sentence reduction brought by the BOP.") (citing *Brooker*, 2020 WL 5739712, at *8) (internal citations omitted).

Mr. Brown moves the Court to grant his motion for compassionate release because, "[g]iven [his] underlying health conditions, and complete lack of medical care to treat them, he is exceptionally vulnerable to contracting the deadly disease with devastating consequences to his health." Def.'s Mem. at 14. Specifically, Mr. Brown argues that he suffers from several medical

3

conditions, including "[c]hronic kidney disease," *id.* at 5-7; obesity, *id.* at 9-11; and hypertension, *id.* at 11; and is "at risk for . . . cardiovascular disease," *id.* at 7. Mr. Brown argues that his facility, FCI Allenwood Medium, is not providing "the medical attention he needs to take an active role in preserving his own physical health," and he is in "desperate need of a nephrologist and a cardiologist," but is not being adequately tested and treated for his alleged underlying conditions. *Id.* at 5. Mr. Brown argues that several of his alleged preexisting conditions put him at greater risk for suffering complications should he become infected with COVID-19. *Id.* at 9-11; Def.'s Supp. Mem. at 1.

Mr. Brown argues further that because he has served approximately sixty-three percent of his statutory term, the time he has already served "is sufficient to satisfy the purposes of sentencing." Def.'s Mem. at 12. He argues that he is "an ideal candidate for release" because he has "maintained exemplary conduct while he has been incarcerated" and had only been written up for one infraction in the federal system. *Id.* at 13. He also notes that he has "attempted to start planning his re-entry into life outside of prison," stating that he "plans to reside with his girlfriend" and "intends to work as a mentor to at-risk youth by sharing his experiences and advising them on ways they can avoid the mistakes he made in his life." *Id.*

The Government opposes Mr. Brown's motion. The Government argues that Mr. Brown has not established extraordinary and compelling reasons for release based on his medical conditions because (1) "[t]he medical records do not support [Mr.] Brown's claim that he suffers from chronic kidney disease," Gov't Opp'n at 5; (2) Mr. Brown is not obese, but rather, merely overweight, *id.* at 6; and (3) Mr. Brown is only "at risk for," not affirmatively "suffer[ing] from[,] a serious heart condition," *id.* The Government also argues that as of the time of filing its

4

opposition, FCI Allenwood Medium had zero positive inmate and only three positive staff cases of COVID-19. *Id.* at 4 n.2.

With respect to the § 3553(a) factors, the Government "opposes [Mr. Brown's] release based on the need for deterrence and to protect the public and the need for the sentence to reflect just punishment and promote respect for the law." *Id.* at 7. The Government argues that "[Mr.] Brown was [an] integral member of a drug conspiracy responsible for the distribution of 3.5 to 5 kilograms of cocaine," activity he engaged in immediately after completing a prison sentence for possession with intent to sell narcotics and possession of a firearm. *Id.* The Government notes that he "resumed selling crack cocaine" even "[d]espite a 7-year special parole sentence, a monitoring bracelet and . . . curfew," showing that parole restrictions "had zero deterrent effect" on his behavior. *Id.* The Government points out Mr. Brown's "long history of selling drugs" and other criminal activity. *Id.* at 8. Finally, the Government argues that Mr. Brown has already received a below-Guidelines sentence and that any further reduction would be improper under § 3553(a). *Id.*

The Court will address each of the relevant factors in turn.

1. **Exhaustion**

Normally, under 18 U.S.C. § 3582(c)(1)(A), a court may not modify or reduce a defendant's sentence on that defendant's motion when the defendant has not exhausted his administrative remedies by either (1) appealing a failure of the BOP to bring such a motion on the defendant's behalf or (2) the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility.

The parties agree that the exhaustion requirement has been met. Def.'s Mem at 4-5; Gov't Opp'n at 4. Mr. Brown submitted a compassionate release request to the Warden on June 30, 2020. Def,'s Mem. at 4. His request was denied on July 13, 2020. Def.'s Mem at 4.

5

As more than thirty days have passed since Mr. Brown submitted his request to the Warden, the Court agrees that the exhaustion requirement has been satisfied and that Mr. Brown's motion is properly before the Court.

### 2. Extraordinary and Compelling Reasons

Since the outbreak of the COVID-19 pandemic, numerous courts within this Circuit have held that a defendant's pre-existing health conditions in combination with the increased risks of COVID-19 in prisons constitute "extraordinary and compelling reasons" warranting relief. *See, e.g.*, *United States v. Delgado*, 457 F. Supp. 3d 85, 2020 U.S. Dist. Lexis 84469, at *7 (D. Conn. Apr. 30, 2020) (granting compassionate release where the defendant had a BMI of 40.2, finding that his "severe obesity and sleep apnea put him at increased risk should he contract COVID-19"); *United States v. Daugerdas*, -- F. Supp. 3d --, 2020 WL 2097653, at *3 (S.D.N.Y. 2020) (defendant serving a 180-month term of imprisonment and incarcerated at a facility with no reported cases of COVID-19; the district court found that his underlying health conditions—Type II diabetes, obesity, hypertension, and high cholesterol—and the risk of COVID-19 in prisons generally constituted an extraordinary and compelling reason, but did not ultimately grant compassionate release); *United States v. Morales*, No. 3:19-cr-121 (KAD), 2020 WL 2097630, at *3 (D. Conn. May 1, 2020) (recognizing district courts have found that "[a]sthma is a condition that places a person at increased risk for serious complications, or even death, if the person contracts COVID-19[,]" and "creates a[n] extraordinary and compelling reason for sentence reduction"); *United States v. McCarthy*, 453 F. Supp. 3d 520, 527 (D. Conn. 2020) ("[Mr.] McCarthy is 65 years old and suffers from COPD, asthma, and other lung-related ailments . . . . The defendant's age and

medical condition, taken in concert with the COVID-19 public health crisis, constitute an extraordinary and compelling reason to reduce [Mr.] McCarthy's sentence.").

Mr. Brown argues that he suffers from or is at risk for four medical conditions: (1) chronic kidney disease, Def.'s Mem. at 5-7; (2) athlerosclerotic cardiovascular disease, *id*. at 7; (3) obesity, *id*. at 9-10; and (4) hypertension, *id*. at 11.

With respect to his kidneys, Mr. Brown does not argue that has been formally diagnosed with kidney disease, but instead argues that evidence in his medical records indicate a likely finding of this condition. *Id*. at 5. In particular, he identifies recurrent "stabbing pains in his lower back," which records show may be lingering aftereffects of a 2001 gunshot wound, but which Mr. Brown argues are more "likely . . . a symptom of chronic kidney disease." *Id*. He notes that his medical records show an "elevated creatinine level," and that he "has noticed a change in his urination habits," both of which point toward kidney ailments. *Id*. at 5-6. He argues that his "possible undiagnosed chronic kidney disease" puts him at greater risk for pneumonia, which, when taken together, "put[s] him at a greater risk of contracting COVID-19 and suffering dire consequences from the disease if he contracts it." *Id*. at 6.

With respect to his heart, Mr. Brown argues that his medical records "indicate that he is at risk for atherosclerotic cardiovascular disease, but a lack of lab tests prevents the prison physicians from making an accurate diagnosis." *Id.* at 7. He argues that "[p]re-existing cardiovascular disease seems to be linked with" more severe COVID-19 outcomes. *Id*. He argues that he has not been "afforded the opportunity to consult with specialists in his areas of need," including a cardiologist and nephrologist. *Id.*

With respect to his weight, Mr. Brown clarifies in his supplemental memorandum that he is not obese but, rather, is overweight. Def.'s Supp. Mem. at 3-4. He nonetheless argues that he is

7

"on the verge of becoming medically obese and may suffer the same consequences as if he were technically obese." *Id.* at 4.

Finally, with respect to his hypertension, Mr. Brown argues that he has "a history of hypertension" but allegedly "has not received any medication" during his time at FCI Allenwood Medium. *Id.* at 11. Mr. Brown notes that he had at least one "high-normal" and not hypertensive blood pressure reading but has also had several other readings in the hypertensive range. *Id.*

The Government argues that the medical records do not support Mr. Brown's claim that he suffers from chronic kidney disease because his attempt to attribute his back pain, frequent urination, and elevated creatine levels to kidney problems is a "speculat[ive]" "self-diagnosis." *Id.* at 5-6. The Government notes that "[n]o medical professional has diagnosed [Mr.] Brown with [chronic kidney disease]." *Id.* at 6. The Government also notes that Mr. Brown is overweight, not obese. *Id.* Finally, the Government argues that Mr. Brown is only "at risk" for cardiovascular disease, and that there is "no indication in the medical records" that he actually "suffers from a serious heart condition." *Id.* at 6. The Government argues that his medical records in fact "document no issues" with his heart health. *Id.*

The Government does not address Mr. Brown's claims of hypertension.

The Court recognizes that there are significant factual disputes between the parties as to (1) whether Mr. Brown is at risk of or actually suffers from decreased kidney or heart function and (2) whether any such indications, or Mr. Brown's status as overweight, but not obese, constitute conditions that would indirectly or directly increase Mr. Brown's risk of suffering acutely from COVID-19.

With respect to Mr. Brown's hypertension, which the Government does not dispute, courts in this District, and other courts in this Circuit, have held that this condition, combined with the

8

COVID-19 pandemic, may constitute extraordinary and compelling reasons for release. *See United States v. Sedge*, No. 16-cr-537 (KAM), 2020 WL 2475071, at *3 (E.D.N.Y. May 13, 2020) ("Given that the defendant is over 50 and has demonstrated existing medical conditions that would place him into a high-risk category including hypertension, hyperlipidemia, and coronary artery disease, defendant has demonstrated that he is at a higher risk for suffering life threatening complications from COVID-19."); *United States v. Pena*, 459 F. Supp. 3d 544, 550–51 (S.D.N.Y. 2020) (defendant had hypertension and hyperlipidemia, and the district court recognized the heightened risk hypertension poses); *United States v. Scparta*, -- F. Supp. 3d --, No. 18-cr-578 (AJN), 2020 WL 1910481, at *9 (S.D.N.Y. Apr. 20, 2020) (defendant suffered from "hypertension, sleep apnea, high blood pressure, and high cholesterol" and the court recognized that the CDC "has identified hypertension as a comorbidity that increase the likelihood of serious risk from COVID-19"); *United States v. Sawicz*, -- F. Supp. 3d --, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. Apr. 10, 2020) (finding that, where a defendant suffered only from hypertension, "the COVID-19 pandemic, combined with [the defendant's] particular vulnerability to complications from COVID-19 . . . constitutes an 'extraordinary and compelling reason' for his release").

Additionally, "in determining whether 'extraordinary and compelling reasons' warrant a prisoner's early release, courts routinely consider the status of coronavirus infections at the particular institution where the defendant is housed." *United States v. Colon*, No. 3:97-cr-48 (SRU), 2020 WL 6049215, at *7 (D. Conn. Oct. 12, 2020) (collecting cases). Mr. Brown argues that there has been a "sudden increase in the number of COVID-19 infections" at FCI Allenwood Medium and that, as of October 1, 2020, there were 27 positive inmate cases and six positive staff cases at the facility. Def.'s Supp. Mem. at 2 (citing Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus, ECF No. 1150, Ex. A). As of November 3, 2020, FCI

9

Allenwood Medium had one open positive inmate case and 11 positive staff cases; 113 inmates had contracted, but recovered from, the coronavirus.[1]

The Government does not dispute either that the fact that Mr. Brown has hypertension or the conclusion that a diagnosis of hypertension increases the risk of severe illness should Mr. Brown contract COVID-19. But, given the decreasing rates of infection since October 1, "while the situation [at FCI Allenwood Medium] is not ideal, neither is it dire, unlike that of many BOP facilities. Indeed, the risk of contracting COVID-19 is present outside prison as well." *United States v. Cleveland*, No. 12-cr-6109 (FPG), 2020 WL 5651607, at *3 (W.D.N.Y. Sept. 23, 2020).

In any event, because Mr. Brown's motion fails for other reasons, the Court need not definitively resolve whether Mr. Brown has demonstrated an extraordinary and compelling reason for a sentence reduction.

### 3. Section 3553(a) Factors

After establishing that extraordinary and compelling reasons exist, "Section 1B1.13 of the Guidelines further provides that a court may reduce a term of imprisonment only if the court determines that '[t]he defendant is not a danger to the safety of any other person or to the community[,]'[ ] and only after considering the factors listed in 18 U.S.C. [§] 3553(a)." *McCarthy*, 453 F. Supp. 3d at 526.

Mr. Brown argues that "the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents to a person in Mr. Brown's condition." Def.'s Mem. at 12. He argues that he has served nearly two-thirds of his

---

[1] The Bureau of Prisons' coronavirus data includes "confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths" and updates this information each weekday. Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus (last accessed Nov. 3, 2020). This information therefore includes data as to both "open" cases, or inmates and staff currently testing positive, and past cases, or inmates and staff who have recovered from or died due to COVID-19 throughout the course of the pandemic.

10

statutory term and is eligible for home detention as of August 26, 2022. *Id.* He argues further that he "has maintained exemplary conduct while he has been incarcerated," and has only committed one infraction while in federal prison. *Id.* at 13. He argues that he has a plan for release, which includes residing with his girlfriend and working as a mentor to at-risk youth. *Id.*

The Government argues that Mr. Brown's criminal history, combined with the severity of the crime that resulted in his incarceration, makes him an inappropriate candidate for release. Gov't Opp'n at 7-8. The Government argues that his incarceration resulted from his involvement in a drug conspiracy involving multiple kilograms of cocaine, which he became involved with "fresh off a three-year prison sentence for criminal possession of a firearm and possession with intent to sell narcotics." *Id.* at 7. The Government notes that Mr. Brown "sold copious amounts of cocaine and crack cocaine" with multiple co-defendants and did so while on parole; "[t]he prospect of returning to prison for an additional seven years . . . had zero deterrent effect." *Id.*

In the Government's view, Mr. Brown's decision to "return to what he has always done, sell[ing] drugs," rather than "try[ing] to get a legitimate job when he was released from prison," shows that he is unlikely to be deterred from future criminal conduct. *Id.* at 8. The Government also notes Mr. Brown's long criminal history, including that "[h]is last state conviction immediately followed another conviction involving a firearm and drugs," which "immediately follows a conviction for robbery where [Mr.] Brown was sentenced to prison for 18 years, suspended after seven years." *Id.* at 8. As the Government argues, "[Mr. Brown's] decision to engage in serious criminal conduct was considered and calculated and reflected a conscious decision to disregard the safety and health of the public." *Id.* As a result, the Government argues that "[r]eleasing [Mr.] Brown to home confinement does not mitigate his danger to the community" nor would it "serve as a deterrent for [Mr.] Brown," but rather would "endanger[] the community

11

and undercut[] any deterrent value the Court intended with the imposition" of a below-Guidelines sentence. *Id.*

The Court agrees.

Here, the § 3553(a) factors weigh against Mr. Brown's release.

Most significantly, Mr. Brown's current term of incarceration stems from a serious drug-conspiracy offense, which he committed while under supervision for another crime, specifically, a special term of parole. Presentence Report, ECF No. 730 ¶ 52 (June 15, 2017). At sentencing, Mr. Brown's criminal history category was VI. *Id.* ¶ 53. He has an extensive criminal record and a history of committing both serious drug offenses and other, occasionally violent, offenses while under parole or supervised release. *See id.* ¶¶ 40-52. The record also shows that on multiple occasions, Mr. Brown has previously escaped from community release or absconded from parole. *See id.* ¶¶ 45, 48, 49.

The Court appreciates the steps that Mr. Brown has taken while incarcerated, such as taking college preparatory and practical life skills classes, *see* Inmate Education Tr., ECF No. 1144-2, Ex. A (Sept. 18, 2020). But his sentence must "reflect the seriousness of the offense, . . . and . . . provide just punishment for the offense[.]" 18 U.S.C. § 3553(a)(2)(A). *See United States v. Gamble*, 3:18-cr-0022-4 (VLB), 2020 WL 1955338, at *6 (D. Conn. Apr. 23, 2020) (denying motion for release "because Defendant is ill suited for home confinement because of his lengthy criminal history and [because] no conditions [of release] could adequately protect the public"); *United States v. Lopez*, 16-cr-317 (PAE), 2020 WL 3100462, at *3 (S.D.N.Y. June 10, 2020) (denying motion for compassionate release where defendant had sixty-six months left of his sentence and "release now, or any time soon, [was] therefore incompatible with the sentence [the

original Judge] thoughtfully imposed, even considering the new facts that have emerged in connection with the pandemic").

And these efforts, while commendable—and hopefully, reflective of a broader and more sustained interest in living a more productive life—are not yet sufficient to warrant a finding that his continued imprisonment no longer remains necessary to ensure the safety of the community.

Accordingly, having considered and weighed all of these factors as well as those set forth in 18 U.S.C. § 3553(a), the Court concludes that they weigh against immediate release.

### IV.    CONCLUSION

For the reasons explained above, the motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 6th day of November, 2020.

/s/ Victor A. Bolden
Victor A. Bolden
United States District Judge